TERRY L. JONES ET AL., APPELLANTS, V. EMPLOYERS MUTUAL CASUALTY CO., APPELLEE.

432 N.W.2d 535

Filed December 9, 1988.   No. 86-1023.

Robert B. Creager, of Berry, Anderson, Creager & Wittstruck, for appellants.

Robert T. Grimit, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee.

HASTINGS, C.J., CAPORALE, and GRANT, JJ., and MORAN and BROWER, D. JJ.

HASTINGS, C.J.

Plaintiffs appeal from a judgment generally in favor of the defendant on various claims for damages under a policy of insurance. The plaintiffs consist of a partnership, a corporation, and two individuals. However, at the time of trial, Terry L. Jones, who together with his wife owned all of the stock in Jones Oil Company, Inc., a Nebraska corporation, was the president of Jones Oil Company, and further reference in this opinion to the plaintiffs will be in the name of Jones only. The defendant, Employers Mutual Casualty Company, issued the policy involved in this litigation and will be referred to as

Employers.

Jones assigns as error the failure of the trial court to allow recovery of damages, the finding by the trial court that the losses were subject to policy exclusions, and the failure of the court to allow reformation of the policy. The trial court made extended findings of fact and conclusions of law in its final judgment order.

Because this is a law action in which a jury was waived, the findings and conclusions of the trial court have the effect of a jury verdict and will not be set aside unless clearly wrong. *Gottsch Feeding Corp. v. Red Cloud Cattle Co.*, 229 Neb. 746, 429 N.W.2d 328 (1988); *Fisbeck v. Scherbarth, Inc.*, 229 Neb. 453, 428 N.W.2d 141 (1988). However, whether the plaintiffs' loss was covered by the insurance policy is a question of law. *Roth v. Farmers Mut. Ins. Co.*, 220 Neb. 612, 371 N.W.2d 289 (1985).

The business in which Jones is engaged involves retail and wholesale distribution of gasoline and other petroleum products, as well as the ownership and operation of several service stations throughout Nebraska. In the normal course of business during the period in question, Jones would purchase gasoline from the refinery at one of the terminals in Nebraska. He would cause the gasoline to be transported by common carriers to one or more stations, where it would be transferred to storage tanks at those locations. Jones would charge the operators of the stations his cost plus a profit of 3 cents per gallon.

At the time the carrier would pick up the gasoline at the terminal, the pump would meter the exact number of gallons loaded, and that amount was stamped onto a manifest which was signed by the trucker. When the carrier would deliver the gasoline to the station, the station operating personnel would sign the manifest indicating the receipt of the number of gallons on the manifest. Except in the case of a delivery to a company-owned station, Jones retained no further interest in the gasoline.

At a company-owned station, the procedure for delivery was the same. However, Jones apparently retained title to the gasoline in that instance and would be paid for all gasoline sold

by the station operator as it was sold to the latter's customers. To ascertain the amount due Jones, the station operator was required to record the number of gallons sold from each pump each day (calculated by subtracting the beginning-of-the-day reading from the beginning-of-the-next-day reading). The operator then multiplied the total number of gallons sold by the price asked by Jones (e.g., 3 cents per gallon over Jones' cost), and submitted the daily report and the money owed to Jones. At the locations in question, the station operator was compensated by charging his customers more money per gallon than Jones charged him, and that difference would be his profit.

On October 31, 1980, Jones purchased an "all-risk" policy of insurance from Employers to cover his various properties, including his service stations. The policy was renewed on October 31, 1981, for an additional year.

At the end of the fiscal year, October 31, 1981, Jones' comptroller informed Jones' accountant that the company's records indicated a shortage in the physical inventory at the stations located in Gothenburg, Nebraska, and at 33d and Cornhusker in Lincoln. The company calculated its perpetual inventory by keeping a running record of gallons shipped to the station minus the number of gallons reported by the station operators as sold. The company also conducted a physical inventory by measuring with a dip stick the amount of gasoline actually in the tanks at the station. It was a discrepancy between the perpetual inventory and the physical inventory which triggered the concern in the accountants. The amount of gasoline which the perpetual inventory indicated was in the tanks at the stations exceeded the actual storage capacity of the tanks.

## GOTHENBURG STATION

The first step taken to try to ascertain the nature of the problem which created the shortage at Gothenburg was to hire an independent party to remeasure the physical inventory.

The accountants next set out to reconcile the shortage by analyzing all documents and records from November 1980 to January 24, 1982, relating to the deliveries and daily sales of the gasoline. As a result of this analysis, the shortage was

determined to be 47,725.9 gallons, worth $56,617.24.

Jones himself also investigated the cause of the loss at Gothenburg. He hired a firm to check the tanks for leakage and to check the accuracy of the meters. He offered a $1,000 reward for information pertaining to the alleged theft.

He also contacted the Nebraska State Patrol, which assigned the case to an investigator. That investigator monitored the station for five nights from a cafe to watch for someone stealing the gasoline from the fill spouts. Jones deliberately ordered fuel in excess of the then known capacity of the tanks to try to determine whether the common carrier driver might just keep "his mouth shut" and go ahead and shortchange Jones. However, the driver immediately reported when the tank was full.

Although none of the investigative techniques employed were successful, there were no further shortages after Jones discussed the shortage with the operator of the station.

### 33d AND CORNHUSKER STATION

Shortly thereafter, a shortage at the Cornhusker Highway location in Lincoln was discovered. Jones' accountant determined that the shortage there was worth $36,140.21. The investigation into the loss was essentially the same as the investigation undertaken at Gothenburg; i.e., the accountants doublechecked their records and the police department set up a surveillance at night. During the course of the investigation, the operator of the station was interviewed and confessed to turning the meters back. That is, he was tampering with the meters so that his record of reported sales was less than his actual sales, and thus the money that he was remitting to Jones was far less than the money he was actually bringing in. However, the operator only confessed to shorting Jones approximately 3,200 to 3,500 gallons, much less than the 29,322.4 gallons the accountants had determined the shortage to be. After the arrest of the operator, no further shortages occurred at the Cornhusker station.

### EXPLOSION AT ST. PAUL, NEBRASKA

On June 1, 1982, an explosion occurred at Jones' station in St. Paul, Nebraska. The comptroller calculated that the station lost 1,685 gallons, presumably due to leakage. The total worth

of this gasoline was $1,965.05. The parties stipulated that the station was reasonably closed for repairs for 14 days. There was also evidence introduced as to the cost of those repairs.

## ACTION OF TRIAL COURT

Jones filed claims with Employers for the losses sustained at the three locations. Employers denied coverage. Jones subsequently brought suit against Employers, and the case was tried on January 27, 28, and 29, 1986, with closing arguments had in March. On April 8, 1986, Jones moved to amend the petition, in part seeking reformation of the policy to conform to the intent of the parties. The court overruled the motion.

On October 24, 1986, the court issued its order awarding Jones $2,001.24 for his business interruption claim at the St. Paul station, and denying him recovery for all other claims. The court also ordered reasonable attorney fees to be determined after further showing and argument. The court has not yet taken action on the matter of fees.

## INSURANCE POLICY TERMS

The policy of insurance applicable in this case contains as endorsements forms MP 00 13 and MP 00 14, both of which apply to Cornhusker Highway, but only MP 00 13 relates to St. Paul and Gothenburg. MP 00 13 states in part: "This policy does not insure under this form against: . . . 6. unexplained or mysterious disappearance of any property, or shortage disclosed on taking inventory . . . ." MP 00 14 is almost identical, but it eliminates the word "any" before property and adds "of property" after shortage.

Also included within the policy was endorsement MP 04 50, including employee dishonesty blanket coverage. In substance, that form provided for coverage for loss of money, securities, and other property resulting directly from fraudulent or dishonest acts committed by an *employee*.

Finally, attached to the policy was a "Deductible Endorsement" (form 2050.4), which applied a $1,000 deductible amount to each occurrence.

## ANALYSIS

Although the briefs discuss a number of issues, a resolution of this case depends upon the exclusion as to inventory, the deductible clause, and the denial of reformation.

The trial court held that the provision of the policy which excluded coverage for loss due to shortage of property disclosed by inventory precluded recovery by Jones. The principal case cited by Employers in support of that conclusion is *Paramount Paper Products Co., Inc. v. Aetna Cas. & Sur. Co.*, 182 Neb. 828, 157 N.W.2d 763 (1968).

In *Paramount*, the clause under consideration provided in part: " 'This Policy does not apply: . . . (b) to loss, . . . the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation . . . .' " *Id.* at 829-30, 157 N.W.2d at 764. In that case, the plaintiff's printing plant noticed a large discrepancy between the amount of paper purchased and the amount used in the business. An investigation uncovered two thefts by employees, in which the goods were recovered and no claim was made. The plaintiff then sought to determine, through inventory computations, the amount of any other loss alleged to be attributable to employee theft. Unit-basis inventories were converted to dollar values; these values were compared to the dollar value of the goods sold; and a loss was determined.

After noting that other courts' decisions in this area ranged from strict interpretation of the exclusionary clause, to liberal construction of the clause, to a denial that reasonably reliable unit-basis inventories actually constituted inventory computations, this court disallowed recovery for the plaintiff based on the clause. The court was particularly bothered by the untrustworthiness of a unit-basis inventory converted and computed to account for dollar values, sales, purchases, waste, etc. The court concluded:

> [P]laintiff has failed to prove by either direct or circumstantial evidence any loss whatsoever by reason of employee dishonesty. It has simply shown that such dishonesty had existed and, by inference, it seeks to attribute its entire loss revealed by an inventory computation to employee dishonesty.

*Id.* at 839, 157 N.W.2d at 769.

Other cases have also considered the situation in which evidence of some employee dishonesty existed. *Prager & Bear,*

*Inc. v. Federal Ins. Co.*, 66 Cal. App. 3d 970, 136 Cal. Rptr. 340 (1977), involved facts very similar to the instant case. The plaintiff in *Prager* kept records of daily receipts and shipments, which were tabulated daily and monthly as part of a perpetual inventory. A physical count of the goods was made each June and December. After the physical count in June 1970, plaintiff noted a large discrepancy between the perpetual inventory records and the actual count. When the discrepancy grew after the physical counts in December 1970 and June 1971, plaintiff filed an insurance claim. The claim was denied on the basis of the inventory shortage exclusion clause. The warehouse manager eventually confessed to fraudulent activity between September 1971 and April 1972, but the insurance company refused to compensate the plaintiff for losses occurring outside of this time period.

The California court extensively discussed various cases which had considered how much independent evidence, outside of inventory shortages, is required to raise an inference of employee dishonesty. The court concluded that despite the employee's confession of dishonesty between September 1971 and April 1972, there was no evidence tending to prove that the losses occurring before and after this time period were the result of employee dishonesty. The court held that "[n]otwithstanding the reliability of such inventory computation methods," the plaintiff "was not entitled to prove the fact *or* amount of such losses by inventory computations." (Emphasis supplied.) 66 Cal. App. 3d at 979, 136 Cal. Rptr. at 345.

In *Gillette Company v. Travelers Indemnity Company*, 365 F.2d 7 (7th Cir. 1966), plaintiff's employee stole merchandise, which was recovered. Plaintiff then used inventory computations to determine that other losses had occurred, and the amount of those losses. The court held that the plaintiff had not proved further employee dishonesty and strictly applied the inventory exclusion to deny recovery based on the inventory computations alone.

Many other cases have considered the use of inventory comparisons for corroboration of independent evidence of employee dishonesty. See, *Danal Jewelry Co. v. Fireman's Fund Ins.*, 107 R.I. 33, 264 A.2d 320 (1970) (inventory

comparisons not permitted to establish full amount of loss, where employees caught with stolen goods); *Fort Smith Tobacco & Candy Co. v. American Guar. & L. Ins. Co.*, 208 F. Supp. 244 (W.D. Ark. 1962) (even though some loss proved to be caused by employee dishonesty, any inference that entire loss as shown by inventory shortage was caused by employee dishonesty was too uncertain and speculative to be permissible); *Locke Distributing Co. v. Hartford Acc. & Indem. Co.*, 407 S.W.2d 658 (Mo. App. 1966) (inventory comparisons not permitted as evidence even though employees confessed to dishonesty).

To be sure, there are cases to the contrary, particularly holdings that once there is proof that a loss has been suffered by reason of theft, there is no prohibition as to the use of inventory records to show the amount of the loss. Thus, it becomes a question of policy. We believe the wiser course is to give effect to the clear meaning of the exclusionary clause.

The plain language of the exclusionary clause precludes the use of the inventory comparisons. The loss was clearly discovered upon taking inventory. This court has held that an insurance company has the right to restrict its liability by including limitations in the policy, and if the limitations are clearly stated and unambiguous, the insurance company is entitled to have the terms enforced. *Swedberg v. Battle Creek Mut. Ins. Co.*, 218 Neb. 447, 356 N.W.2d 456 (1984); *Great Plains Ins. Co., Inc. v. Kalhorn*, 203 Neb. 799, 280 N.W.2d 642 (1979); *Lonsdale v. Union Ins. Co.*, 167 Neb. 56, 91 N.W.2d 245 (1958).

> " 'Construction ought not to be employed to make a plain agreement ambiguous for the purpose of interpreting it in favor of the insured. The policy should be given meaning and effect according to the sense of the terms which the parties have used, and if they are clear they should be taken in their plain and ordinary sense.' "

(Emphasis omitted.) *Roth v. Farmers Mut. Ins. Co.*, 220 Neb. 612, 616, 371 N.W.2d 289, 292 (1985), quoting *Swedberg, supra*, and *Safeco Ins. Co. of America v. Husker Aviation, Inc.*, 211 Neb. 21, 317 N.W.2d 745 (1982). The trial court was correct in its conclusion that the claims as to Gothenburg and

Cornhusker were barred by the inventory shortage exclusion.

There is an added factor at Cornhusker, and that has to do with the fact that the dealer-operator confessed to stealing "around" 3,200 to 3,500 gallons' worth of gasoline. Jones claims, through inventory records, a loss of approximately 30,000 gallons at Cornhusker. Jones apparently had told the police that the shortage was in the vicinity of 16,000 gallons. It is apparent that, based upon those discrepancies, the trial court concluded that the evidence of loss or damages was not credible. Jones had the burden of proving his damages. The evidence as to the damages was conflicting and inconclusive and, in the case of the inventory records, not allowable under the policy.

The loss at St. Paul falls in a somewhat different category. The primary damage was caused by explosion, which everyone agrees was covered. However, the loss of gasoline was not the result of the explosion. The shortage again was discovered by the inventory method, which is excluded by the policy. There seems to be no dispute as to the recovery allowed by the trial court for actual damage of property in the explosion.

There is yet another reason why Jones has failed in his burden of proof, which is applicable to his claimed losses at all locations. Jones' policy carried a deductible clause. The district court found that Jones had not proved how many separate losses had occurred and the amount of each loss. Presumably, if the shortage was the result of multiple incidents, the amount of each individual loss might not exceed the deductible, and thus would not be covered.

The testimony throughout the trial reflects that Jones had no way of knowing whether one or several incidents contributed to the shortage. All he could say was that a shortage had occurred between two inventory periods. The deductible was $1,000 per occurrence. Therefore, if, for example, more than 36 incidents occurred at the Cornhusker station within the time period between inventories, that shortage would not be covered. The insured has the burden to bring himself within the terms of the policy. *Ditloff v. State Farm Fire & Cas. Co.*, 225 Neb. 375, 406 N.W.2d 101 (1987); *Swedberg v. Battle Creek Mut. Ins. Co., supra*. This Jones failed to do.

Jones also claims that his losses should have been covered under the employee blanket bond coverage. The simple answer to that is that the operators were not employees. Whether they were lessees or independent contractors is not important. They were not treated as employees on the books and records of Jones' business. No tax or Social Security was withheld. Jones himself, when asked if he considered them as employees, answered, "I tried very hard to prove that they were not employees." By the plain language of the endorsement and the facts in the record, there was no coverage in this instance.

Finally, Jones complains that the trial court erred in denying his request to amend his petition, some 2 months after trial, to seek reformation of the policy. Throughout the trial, Jones attempted to introduce evidence which appeared to bear on that issue to which objections were made and sustained. However, he also insisted at all times that he was not trying to reform the policy. Rather, he argued that a defendant is entitled to avail himself of a defense based on the real contract between the parties without first having the instrument reformed. He cites us to *Garbark v. Newman*, 155 Neb. 188, 51 N.W.2d 315 (1952), in support of that contention.

*Garbark* was an action at law in which the answer of the defendant requested reformation of a written document, whereupon the trial court transferred the case to the equity docket because of the request for reformation, denied the plaintiff's demand for a jury trial, and heard and decided the case without a jury. It was stated in *Garbark* at 192-93, 51 N.W.2d at 320:

> The modern system of practice does not make it necessary to secure a formal reformation of a written instrument, where it differs from the true agreement entered into between the parties, in order to enforce the instrument as it should have been made. Likewise it is now recognized that a defendant is entitled to avail himself of a defense based on the real contract between the parties, where the written instrument fails to show the true agreement, without first having the instrument reformed.

All that case stands for, with respect to the issue under consideration, is that *if* Jones would have raised properly the

issue of reformation before trial, it would not have been necessary, contrary to the pre-*Garbark* rule, to transfer the case to the equity docket to determine first any equitable claims or defenses.

The problem here is that Jones did not raise in a timely fashion the issue of reformation. As a matter of fact, he denied that such issue existed. The opposing party is entitled to rely on the pleadings in preparing and trying his or her case. "The right to reformation must be properly raised by the pleadings." 66 Am. Jur. 2d *Reformation of Instruments* § 104 at 634-35 (1973). See, also, *Strauss v. Monitor Specialty Co.*, 89 Neb. 176, 131 N.W. 193 (1911).

Leave to amend pleadings to conform to the evidence rests within the discretion of the trial court. *Remington v. Bryan*, 205 Neb. 372, 288 N.W.2d 253 (1980). There is a real question as to whether the proof submitted was sufficient, in any event, to support such amendment.

Reformation may be decreed where there has been a mutual mistake or where there has been a unilateral mistake caused by the fraud or inequitable conduct of the other party. The mistake must be proven by clear and convincing evidence. *J. J. Schaefer Livestock Hauling v. Gretna St. Bank*, 229 Neb. 580, 428 N.W.2d 185 (1988); *Ridenour v. Farm Bureau Ins. Co.*, 221 Neb. 353, 377 N.W.2d 101 (1985). The evidence of the true intent of the parties must be clear, convincing, and satisfactory, and the evidence must establish that the mutual mistake involved is common to both parties, each laboring under the same misconception. *Childers v. Conservative Sav. & Loan Assn.*, 229 Neb. 715, 429 N.W.2d 325 (1988); *Du Teau Co. v. New Hampshire Fire Ins. Co.*, 156 Neb. 690, 57 N.W.2d 663 (1953). Even considering Jones' offers of proof, he has not clearly and convincingly shown that his conception of the policy's coverage was anything other than the actual agreed-upon coverage of the policy, that he was not aware of the policy's provisions, or that he was misled as to the policy's provisions. As a matter of fact, counsel's argument at trial supports these conclusions. There is a strong presumption that a written instrument correctly expresses the intention of the parties to it. *Gretna St. Bank, supra; Ridenour, supra.* Jones

has not overcome that presumption.

The judgment of the district court is affirmed.

AFFIRMED.