FIFTH DIVISION

July 30, 1999

nunc pro tunc
 June 11, 1999

No. 1-98-0701

REEDY INDUSTRIES, INC.,  ) Appeal from the

  ) Circuit Court of 

Plaintiff-Appellant,  ) Cook County.

  )

v.  )

  ) No. 96 L 9364

HARTFORD INSURANCE COMPANY OF   )

ILLINOIS,  ) The Honorable,

  ) David G. Lichtenstein,

Defendant-Appellee.  ) Judge, Presiding.

PRESIDING JUSTICE HOURIHANE delivered the opinion of the court:

Plaintiff Reedy Industries, Inc. (Reedy) filed a claim under a commercial crimes policy issued by defendant Hartford Insurance Company of Illinois (Hartford).  Following Hartford's denial of the claim, Reedy sued for breach of contract.  The circuit court granted Hartford's motion for summary judgment and Reedy appeals.

We affirm.

BACKGROUND

Reedy is in the business of servicing HVAC equipment and maintains an inventory of freon.  On May 13, 1993, Reedy discovered a discrepancy between its freon inventory stored at its North Town Refrigeration facility (North Town) and its general ledger.  The two-foot high, 30-pound freon canisters are stored in a locked "cage"--a 20-foot by 10-foot section of the building, fenced off by a 10-foot to 12-foot high chainlink fence, open at the top. 

Reedy determined that 439 canisters of freon, valued at $83,584.80, were missing.  Concluding that the loss was due to employee theft, Reedy made a claim with Hartford under the employee dishonesty coverage form of its policy.  Hartford denied the claim, and the instant litigation followed.

Under the policy, "Employee dishonesty" is defined as:

"only dishonest acts committed by an 'employee', whether identified or not, acting alone or in collusion with other persons, ***, with the manifest intent to:

(1) Cause you to sustain loss; and also

(2) Obtain financial benefit ***."

There is an exclusion for "Inventory Shortages", defined as:

"loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) an inventory computation; or

(2) A profit and loss computation."

The policy further provides for a $10,000 per-occurrence deductible.  An "occurrence" is "all loss caused by, or involving, one or more 'employees', whether the result of a single act or series of acts."

Hartford moved for summary judgment, arguing that there is no evidence of employee theft; that Reedy's claim is barred under the inventory shortages exclusion; and that Reedy cannot establish that it suffered a loss in excess of the per-occurrence deductible.  In support of its motion, Hartford relied on Reedy's proof of loss; the deposition testimony of two Reedy managers; the sworn statement of a Reedy customer service employee; and Reedy's answers to interrogatories.

Reedy argued in opposition that under the policy the dishonest employee need not be identified; that there was ample proof that no one but an employee could have stolen the freon; and that the inventory shortages exclusion did not apply.  Reedy relied on its own proof of loss, the deposition testimony of its managers, and the testimony of a Hartford claims adjuster.

The circuit court granted Hartford's motion for summary judgment, finding there was no evidence in the record that the freon was stolen or otherwise disposed of by dishonest means, or that the "disposer" was an employee.  This appeal followed.  155 Ill. 2d R. 301.  

ANALYSIS

A motion for summary judgment will be granted only where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 1996).  The aim of summary judgment is not to try issues, but to determine whether triable issues exist.  
Dudek, Inc. v. Shred Pax Corp.
, 254 Ill. App. 3d 862, 868, 626 N.E.2d 1204 (1993).  In determining the existence of any triable issues of fact, the record will be construed strictly against the movant and liberally in favor of the 
opponent.  
Purtill v. Hess
, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986).  
We review the grant of summary judgment 
de novo
.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).   

The evidentiary record before the circuit court reveals that the claimed freon shortage was first discovered by Reedy's inventory manager, Michael Ward.  He testified at his deposition that on or about May 13, 1993, he visited North Town and checked the general ledger on the computer.  He noticed a disparity between the freon account and the actual inventory, and investigated further.  He reviewed the company's purchase orders, vendor invoices, and stock requisition forms for the period March through mid-May 1993, and checked these against the general ledger.  According to Ward, the freon purchased during this period was far in excess of historical purchase patterns.  Theoretically, there should have been 491 canisters of freon on hand on May 14, but a physical inventory revealed only 33 canisters.  After allowing for missing transfer tickets, Ward concluded that 439 canisters of freon, having an aggregate value of $83,484.80, were missing.  He also testified that due to certain government regulations affecting the availability of freon, the price increased dramatically in 1993.

   Ward admitted that it is possible that some stock requisition forms may have been missing from the files he reviewed; that servicemen on some occasions legitimately took freon without completing a stock requisition form; and that some stock requisition forms may have erroneously underreported the number of canisters taken.

It was Ward's recollection that if an employee used his key to gain access to the premises after regular business hours, he had a certain amount of time in which to deactivate the alarm.  Ward was not sure who had keys to North Town and the cage.  Based on their security and the magnitude of the missing inventory, Ward assumed that the freon shortage was due to employee theft.  

Robert Bartnicki, North Town's residential central service manager, explained the procedure for ordering freon.  He testified that either he or Ed Urquhart, the general manager, completes a purchase order and notifies the supplier.  At delivery, he or Urquhart check the physical count against the purchase order and the packing slip.  The packing slip is later checked against the supplier's invoice.  John Rocks, who was chiefly responsible for handling the cage during the day, would help unload the freon.  Bartnicki testified that if Rocks checks the delivery, he or Urquhart verify the count.  Bartnicki guessed that, in addition to the key he had for the cage, Urquhart had a key.  However, he did not recall whether Rocks had a key.  

According to Bartnicki, when freon was needed for a service call, the technician was required to complete and sign a stock requisition form.  He or Rocks would make sure the technician received only the number of canisters shown on the form, which was typically between one and five.  The stock requisition forms were not numbered and Bartnicki knew of no way to determine whether any forms were missing.  The forms were sent to the accounting department weekly and entered on the general ledger to update the perpetual inventory.  Although a physical inventory of all products was conducted annually, the inventory figures were not checked against other records.  

Bartnicki also testified that North Town has two garage doors which can only be opened electronically from the inside.  Depending on the weather, the front door was occasionally left open.  The back door, where deliveries are made, was never left open.  According to Bartnicki, at least five people had a key to the building, including himself, Urquhart, the office manager, and the service manager.  It was Bartnicki's recollection that the front door key disengaged the alarm.  

Bartnicki learned about the missing freon from Ward, but had no knowledge of any investigation by North Town.  While he had no explanation for how the freon disappeared, he thought it must be an employee because it is almost impossible for a nonemployee to gain access to the premises.   Following the discovery of the shortage, the procedure for taking in freon was changed and Rocks' services were no longer needed.

According to John Rocks' sworn statement taken by Reedy on May 20, 1993, he is a mechanic by trade but had been employed by North Town in customer service.  He took telephone orders for service, delivered parts to servicemen, and was a "second man" on some service calls.  He had no idea how to use freon.

Rocks' testimony as to the procedure used by service technicians to obtain freon was consistent with Bartnicki's testimony.  Rocks also testified that when he is away from the building, the cage door is sometimes open upon his return.  According to him, the cage area could be very hectic, particularly on Friday when the servicemen came in for supplies.   Rocks did not have a key to North Town and was aware of only two keys for the cage--the one he had, and a spare that Bartnicki kept.  Although the fence around the cage would shake, Rocks said it is easy to climb, and the freon could be thrown over the top. 

One of the servicemen told Rocks there was a rumor that he was taking the freon and selling it. 

Finally, Sue O'Neill, a Hartford claims specialist, testified that she was assigned to work on Reedy's claim and that John Leftwich, who supervised fidelity claims, felt the loss was probably excluded as an inventory computation.  O'Neill's activity log indicates that the "[i]nsured thinks that the employee who used to be in charge of [the] cage was the one stealing it over an eight-week period", but that the "[i]nsured has no proof."  O'Neill did not recall who at Reedy provided this information.

Reedy's claim was denied on September 10, 1993.  According to O'Neill, that decision would have been made by Leftwich and the Hartford home office.  The claim was subsequently re-reviewed upon learning that Reedy was willing to let Hartford interview employees who witnessed the dishonest conduct.  O'Neill subsequently interviewed Bartnicki, whose name was supplied by Reedy's counsel.  However, she did not feel that Bartnicki supplied any additional information.

Reedy's answers to interrogatories shed no further light on the events surrounding the claimed freon shortage.

In order to withstand Hartford's summary judgment motion, Reedy is not required to prove its case.  However, Reedy must provide the factual basis which would arguably entitle it to judgment.  
Soderlund Bros., Inc. v. Carrier Corp.
, 278 Ill. App. 3d 606, 615, 663 N.E.2d 1 (1995); 
Taruc v. State Farm Mutual Auto Insurance Co.
, 218 Ill. App. 3d 51, 60, 578 N.E.2d 134 (1991).  There must be some evidence from which a factfinder could conclude that a loss occurred, that the cause of the loss was employee dishonesty, and that each "occurrence" was in excess of the $10,000 deductible.  In short, it is incumbent upon Reedy, as the insured, to come forward with some evidence that its claim falls within the terms of the policy.  See 
Village of Hoffman Estates v. Cincinnati Insurance Co.
, 283 Ill. App. 3d 1011, 1014, 670 N.E.2d 874 (1996).  However, it is Hartford's burden to show that a claim falls within a policy provision limiting or excluding coverage.  See 
Pekin Insurance Co. v. L.J. Shaw & Co.
, 291 Ill. App. 3d 888, 892, 684 N.E.2d 853 (1997).
 

The only evidence that Reedy sustained a loss is the analysis performed by Ward, which Hartford argues falls within the inventory shortages exclusion.  This type of exclusion has been a part of many fidelity policies for over four decades.  See 
Daniel Grocer Co. v. New Amsterdam Casualty Co.
, 133 Ill. App. 2d 488, 490, 266 N.E.2d 365 (1971) (
where fidelity bond executed in 1958 contained similar exclusion); 
York Lumber Co. v. Fidelity & Deposit Co. of Maryland
, 331 F. Supp. 1131, 1132 (E.D. Penn. 1971) (where court noted that profit and loss computation exclusion was first adopted in 1957).

   The exclusion was designed to curb abuses by employers insured against employee dishonesty where covered losses were claimed on the basis of mere estimates, but where the losses might actually be the result of bookkeeping errors, waste, or negligence.  Annot., 
Construction and Effect of Clause in Fidelity Bond or Insurance Policy Excluding from Coverage Losses Proved by "Inventory Computation" or "Profit and Loss Computation"
, 45 ALR 4th 1049 (1986).  Despite
 its longstanding use in the insurance industry, there is scant Illinois case law construing this policy language, and there is a divergence of opinion among our sister states as to the types of computations which fall within the exclusion and the effect of such exclusions upon proof of loss.  See 
York Lumber Co.
, 331 F. Supp. at 1132-33 (describing the two distinct lines of cases interpreting the exclusion); 45 ALR 4th 1049.  However, as explained below, we need not reach this issue.  

Under the express terms of the policy, coverage is limited to a loss in excess of $10,000 per occurrence.  Even if we assume that Ward's computations do not fall within the inventory shortages exclusion and that the missing freon was due to employee dishonesty, Reedy failed to present any evidence as to the number of occurrences and which occurrences, if any, are in excess of the deductible.  

We find the circumstances present here analogous to 
Jones v. Employers Mutual Casualty Co.
, 230 Neb. 549, 432 N.W.2d 535 (1988).  In 
Jones
, a gasoline distributor filed a claim under its all-risk policy after discovering a discrepancy between its perpetual and actual inventories of gasoline.  The policy contained a $1,000 per-occurrence deductible.  The insured could say only that the shortage occurred between two inventory periods.  The Supreme Court of Nebraska held that the insured had failed to satisfy his burden of bringing himself within the terms of the policy because he could not establish whether one or several incidents contributed to the gasoline shortage.  "[I]f the shortage was the result of multiple incidents, the amount of each individual loss might not exceed the deductible, and thus would not be covered."  
Jones
, 432 N.W.2d at 541.  See also 
Leader Clothing Co. v. Fidelity & Casualty Co. of New York
, 237 F.2d 7 (10th Cir. 1956) (where fidelity policy limited coverage to $15,000 for loss occasioned by any one employee, it was insured's burden to establish how much each employee had stolen).   Citing 
American Commerce Insurance Brokers, Inc. v. Minnesota Mutual Fire & Casualty Co.
, 535 N.W.2d 365 (Minn. App. 1995), Reedy suggests that the definition of "occurrence" as a "single act or 
series of acts" is ambiguous.  However, Reedy failed to make this argument below and it is, therefore, deemed waived for purposes of review.  
Haudrich v. Howmedica, Inc.
, 169 Ill. 2d 525, 536, 662 N.E.2d 1248 (1996).

Waiver aside, 
American Commerce
 does not support Reedy's claim of ambiguity.  In that case
, the Minnesota Court of Appeals held that the phrase "series of related acts" in a fidelity policy was ambiguous because the term "related" is susceptible of more than one reasonable interpretation.  The policy language here is similar, but not identical.  Further, the decision of the court of appeals was 
reversed
 by
 the Minnesota Supreme Court, which found no ambiguity.  
American Commerce
, 551 N.W.2d 224 (Minn. 1996).

Reedy also argues that its claim is for 
unidentified
 employee coverage and that it need only establish two things in order to survive Hartford's summary judgment motion: that the loss was caused by employee dishonesty, and that it is unable to identify the dishonest employee.  We disagree.

There is no separate coverage provision for loss due to the dishonesty of 
unidentified
 employees.  Rather, it is within the policy definition of "employee dishonesty" that reference is made to unidentified employees.  That is to say, "employee dishonesty" is defined in relevant part as "dishonest acts of an 'employee', 
whether identified or not
".  (Emphasis added.)  Thus, the inability to identify the dishonest employee would not preclude coverage.  However, this does not mean that because the employee's identity cannot be discerned that Reedy is somehow relieved of the burden of bringing its claim within the other terms of the policy, in particular, those terms applying a $10,000 deductible to each occurrence.   

Reedy further argues for the first time on appeal that the phrase, "whether identified or not", contained in the definition of employee dishonesty, is ambiguous and must be construed against Hartford.  However, this issue has been waived.  
Haudrich
, 169 Ill. 2d at 536.  

Finally, Reedy argues that the trial court abused its discretion by proceeding to a determination of Hartford's motion without permitting Reedy to depose Leftwich.  Reedy claims Leftwich holds the answers to four critical issues of fact: (1) what facts were conveyed to him by O'Neill on which he based his denial of Reedy's claim; (2) how Hartford's investigation was directed; (3) what interpretation was applied to specific coverage provisions; and (4) why policy coverage was denied.

A trial court may restrict discovery where probative value is lacking, and its determination thereon will be reversed only where there exists a manifest abuse of discretion.  
Schneiderman v. Kahalnik
, 200 Ill. App. 3d 629, 637, 558 N.E.2d 334 (1990).  A trial court may limit discovery to issues dispositive of a summary judgment motion (
Yuretich v. Sole
, 259 Ill. App. 3d 311, 314, 631 N.E.2d 767 (1994)), and may, in its discretion, deny late motions for discovery of remote matters (
Schneiderman
, 200 Ill. App. 3d at 637).

Reedy only sought to depose Leftwich after discovery was closed.  Further, none of the four "critical issues of fact" identified by Reedy are dispositive of Hartford's summary judgment motion.  Accordingly, the circuit court did not abuse its discretion by refusing to allow Reedy to take Leftwich's deposition prior to ruling on Hartford's motion.

Conclusion 

Because Reedy failed to present any evidence creating a triable issue of fact as to the number of occurrences and which occurrences are in excess of the $10,000 deductible, we find that the circuit court did not err in granting Hartford summary judgment.  Although this is not the exact ground on which the circuit court ruled, we may affirm the court's decision on any basis supported by the record.  
Ruane v. Amore
, 287 Ill. App. 3d 465, 474, 677 N.E.2d 1369 (1997).

Affirmed.

HARTMAN and GREIMAN, J.J., concur.