**BETTER ENVIRONMENT, INC., Plaintiff,**

v.

**ITT HARTFORD INSURANCE GROUP d/b/a Hartford Fire Insurance Company and its Affiliates, Defendant.**

**No. 98–CV–1000.**

United States District Court, N.D. New York.

May 5, 2000.

Carl G. Dworkin, Albany, NY, for Plaintiff.

Nixon Peabody LLP, Attorneys for Defendant, Rochester, NY, Patrick J. Solomon, Kevin M. Fitzgerald, of counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Better Environment, Inc. ("plaintiff") commenced the instant action on June 1, 1998, alleging that defendant Hartford Insurance Company ("defendant") improperly denied coverage for plaintiff's alleged theft loss and interruption of business operations. Plaintiff's complaint sets forth causes of action sounding in breach of contractual obligations, violation of 42 U.S.C. § 1981, tort, and punitive damages. Plaintiff moves for partial summary judgment on its first cause of action for breach of contractual obligations. Defendant opposes and cross-moves for summary judgment dismissing plaintiff's action in its entirety pursuant to Rule 56 of the Federal Rules of Civil Procedure. Oral argument was heard on De-

cember 17, 1999, in Utica, New York. Decision was reserved.

## II. *FACTS*

Plaintiff is a corporation whose purpose was the manufacture of a product invented by its two principals, Charlene Marsh ("Marsh") and Viola Surgick ("Surgick"), and trademarked as "FONECAP." The FONECAP is a material designed for placement over the mouthpiece or earpiece of a telephone to prevent the transmission of germs without affecting the sounds being transmitted or received.[1]

Plaintiff's production of FONECAPs was a new business venture, and plaintiff entered into a lease agreement for premises located at 3301 West Arthington, in Chicago, Illinois (the "premises") for the period October 1, 1995, through September 30, 1996, for the purpose of manufacturing FONECAPs for sale. At the same time, plaintiff arranged for property insurance coverage from defendant, initially through its agent Amsure Associates of Albany, New York, and later through Alexander & Alexander, of Kansas City, Missouri. The policy upon which this lawsuit is based was arranged through Alexander & Alexander and became effective January 28, 1996, (the "policy"). According to the complaint, a representative from Alexander & Alexander visited the premises prior to issuing the policy.

The policy covers the "direct loss of or damage to covered property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss." Consistent with its terms, the policy covers loss of goods due to theft (excluding theft by employees). It also contains a provision stating:

We will pay for the actual loss of Business Income you sustain due to the nec-essary suspension of your "operations" during the "period of restoration." The suspensions must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

The policy excludes coverage for:

Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

A loss falling within the above exclusion would not constitute a "Covered Cause of Loss" under the policy.

Plaintiff alleges in the complaint that on February 5, 1996, upon arriving at the premises, Marsh and Surgick "immediately noticed that several boxes of finished products were missing and that the alarm was on." (Compl.¶ 14.) Plaintiff also submits an affidavit from Surgick stating that "[w]hen we entered [the building] on the morning of February 5th, it was immediately apparent that some of the bags [of FONECAPs] were missing." Plaintiff alleges that following this visual observation, its principals contacted the Chicago police and Alexander & Alexander, reporting that they had been victims of a robbery. According to plaintiff, an inventory calculation was then performed in order to determine "the magnitude of what had been stolen." (Compl.¶ 15.) Based on a comparison with a previous inventory count, plaintiff calculated that 88,000 FONECAPs were missing.[2] In further support of its position, plaintiff offers a copy of a

---

1.  While the verified complaint indicates that Marsh and Surgick hold a patent on this product (Compl.¶ 2), Marsh admits in a subsequent affidavit that this assertion was inaccurate, as the patent was still in the application stage.

2.  Plaintiff, however, has apparently never produced any documentary evidence of its inventory counts. (Spetz Aff. ¶ 12.)

police report containing the language, "victim related to R/Os that upon arrival to the work place, victim observed that some of the merchandise that was produced was stolen."

Defendant, however, points to sworn testimony from plaintiff's principals which indicates that no visual observation of missing inventory preceded the inventory count. When defendant's agent questioned Marsh under oath on June 14, 1996, in the presence of an attorney, as to how the loss was discovered on February 5, 1996, Marsh responded that she had previously asked an employee to do a count of the FONECAPs in stock on that day and he gave her a number "much lower than what [Surgick] had told me we had and when we had counted before ourselves." (Spetz Aff. Ex. G at 135.) Similarly, when Surgick was asked how she found out there was a shortage on February 5, 1996, she replied, "When [Marsh] told me the count was off." *Id.* at 247.

According to Marsh's testimony, the employee had been assigned the task of counting the night before, February 4, 1996, in order to prepare the FONECAPs for packaging and sterilization. *Id.* at 141–142, 151. Further, it was only after Marsh and Surgick determined the count was short, and calculated the number of FONECAPs missing, that they called the police and reported a theft. *Id.* at 158. When Marsh was asked what she informed the police regarding how she discovered that the FONECAPs were missing, she replied as follows:

> Same thing I told you. I asked them to count and then the count was short, and then I asked [Surgick], and then [Surgick] went and checked it and, I guess, deducted the amount from the count she had.

*Id.* at 165. Marsh also stated in her deposition that while the alarm was on that day, it had been buzzing "since the last time we had been there," and "was always

going." (Plaintiff claims that it had been having trouble with petty theft and vandalism ever since setting up its operations). *Id.* at 137, 172. Marsh was asked, "When you first walked into your space, did you notice anything different about it?" Her answer was "No." *Id.* at 141. In fact, Marsh expressly states that the only reason she knew that bags of FONECAPs were missing was "from the [inventory] count." *Id.* at 167. Plaintiff apparently does not deny that it has no physical evidence to show what happened to the allegedly missing stock.

Defendant sent a Senior Property General Adjuster, Gregory DeBoer ("DeBoer"), to the premises shortly after the theft was reported. According to the complaint, DeBoer asked plaintiff's principals, Marsh and Surgick, who was in charge but when they introduced themselves, DeBoer asked, "No, I mean who is really in charge?" *Id.* ¶ 46. DeBoer was thereafter "openly disdainful and refused to treat [Marsh and Surgick] with any respect." *Id.* ¶ 47. Plaintiff alleges that in "words or substance," DeBoer suggested that the theft was staged based on the race or gender of plaintiff's principals.[3] Moreover, plaintiff alleges that the ultimate denial of coverage was "motivated by racial or sexual animus or both." *Id.* ¶¶ 46–51.

Defendant submits an affidavit from DeBoer denying that he considered Marsh or Surgick's race in the course of his investigation. (DeBoer Aff. ¶ 15.) Defendant also provides evidence showing that following DeBoer's investigation, Marsh and Surgick wrote a letter to defendant's president complaining that DeBoer was a racist. Marsh and Surgick stated in the letter that DeBoer immediately asked Marsh to sign a non-waiver, was rude, and "was not interested in looking at the crime scene but very interested in recording my conversation." In response to plaintiff's letter, defendant reassigned plaintiff's claim to Michael Spetz, a Senior General Adjuster. Spetz asserts in his affidavit that com-

---

3. Both principals are African–American.

pleting a non-waiver form and taking a recorded statement are standard procedures in an on-site investigation. (Spetz Aff. ¶ 9.)

Sworn testimony by plaintiff's principals reveals that plaintiff had outstanding loans of approximately $172,000 on the date of the reported theft. Plaintiff had made no income from sales of FONECAPs by that date nor had any orders been placed (plaintiff had purportedly only sent samples out to one company for marketing purposes). Plaintiff concedes that the FONECAPs had no street or market value at the time they were stolen. In addition, plaintiff had not paid rent in over four months, and owed approximately $11,000.00 to its landlord.[4] Although plaintiff concedes that no equipment was taken in the alleged theft, plaintiff produced no additional FONECAPs after February 5, 1996, (plaintiff offers reasons including its decision to return some of the sewing machines purchased because they did not function properly, as well as the decision to vacate the premises). After the theft, plaintiff had approximately 20–25,000 FONECAPs remaining in stock.

Plaintiff made a claim to defendant for the sum of $387,500, considering the $500.00 theft deductible and $300,000 coverage limit for business interruption loss. Plaintiff testified that 88,000 FONECAPs were missing and would have been sold at the price of $1.00 per unit. Defendant denied plaintiff's claim of loss due to theft based on the exclusion quoted above, stating that the loss was disclosed upon the taking of inventory and therefore was not covered by the policy. Defendant likewise denied plaintiff's claim for loss of business income on grounds it did not result from a peril covered by the policy, and because plaintiff had no business income, thereby failing to suffer a loss as defined by the

policy. Spetz sent a letter to plaintiff on August 12, 1996, denying its claim.

Plaintiff seeks $387,500 for breach of contract and $387,500 for violation of 42 U.S.C. § 1981. Plaintiff also seeks $2,500,000 in damages in tort, stating that defendant's racist and sexist denial of coverage was "reprehensible, utterly intolerable and atrocious." (Compl.¶¶ 59–60.) Finally, plaintiff seeks $2,500,000 in punitive damages, ostensibly pleaded as a separate cause of action.

## III. DISCUSSION

### A. Jurisdiction

This Court has original jurisdiction arising from plaintiff's claim under 42 U.S.C. § 1981, as well as diversity jurisdiction. Plaintiff and defendant dispute whether the applicable law should be that of Illinois or New York on the breach of contract action. Plaintiff concedes, however, that the relevant substantive law of each jurisdiction is substantially the same, with the exception of the issue as to whether attorney's fees would be available in the event plaintiff can establish improper claims practices by defendant. Because the Court does not reach the issue of attorney's fees on this motion and cross-motion, it will consider the laws of both New York and Illinois.

### B. Summary Judgment Standard

Summary Judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

4. On February 22, 1996, plaintiff's landlord began taking action to evict plaintiff from the premises. An order of possession and a judgment against plaintiff was entered in the amount $20,435.00 on May 3, 1996. Marsh testified that the landlord was willing to forgive the debt if plaintiff would sign an agreement relinquishing plaintiff's right to sue. Marsh refused to sign the agreement, as she believed plaintiff had a valid counterclaim based on the lack of security on the leased premises.

(1986); *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

## C. *Breach of Contract*

Plaintiff argues that defendant breached an insurance contract as a matter of law when it denied coverage for the alleged theft of 88,000 FONECAPs based on an exclusionary provision in the policy, and also denied coverage for loss claimed under the "business interruption" provision. The parties do not dispute that a valid contract existed between them, nor that such policy contained an exclusion of coverage pertaining to:

Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

▉ While the insured has the burden of proving that a valid policy was in existence on the relevant date and that a loss of property occurred, the insurer has the burden of showing that a claim falls within a policy exclusion. *International Paper Co. v. Continental Cas. Co.,* 35 N.Y.2d 322, 327, 361 N.Y.S.2d 873, 320 N.E.2d 619 (1974); *Reedy Indus., Inc. v. Hartford Ins. Co.,* 306 Ill.App.3d 989, 240 Ill.Dec. 41, 715 N.E.2d 728, 731–32 (1999). In addition, "[t]he ambiguities in an insurance policy are [ ] to be construed against the insurer, particularly when found in an exclusionary clause." *Ace Wire & Cable Co. v. Aetna Casualty & Surety Co.,* 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983) (citation omitted). Nevertheless, "[w]here the provisions of an insurance contract are clear and unambiguous, the courts should not strain to superimpose an unnatural or unreasonable construction." *Maurice Goldman & Sons, Inc. v. Hanover Ins. Co.,* 80 N.Y.2d 986, 987, 592 N.Y.S.2d 645, 607 N.E.2d 792 (1992).

▉ Plaintiff contends that the prevailing view of the courts in this country is that an inventory exclusion clause cannot be used by insurers to disclaim coverage simply because a confirming inventory count was conducted. In support of its argument, plaintiff relies on case law involving employee dishonesty insurance, where such policies contained exclusionary clauses for loss proved solely by inventory computation. *See Blitz Corp. v. Hanover Ins. Co.,* No. 95C2725, 1996 WL 308233, at *2–3 (N.D.Ill. June 5, 1996); *Barr Co. v. Safeco Ins. Co.,* No. 83 C 2711, 1988 WL 64558, at *7 (N.D.Ill. June 15,1988); *Ace Wire & Cable,* 60 N.Y.2d at 397, 469 N.Y.S.2d 655, 457 N.E.2d 761. Plaintiff's general proposition is sound, although *Ace Wire & Cable* primarily involved the tech-

nical definition of "inventory computation," 60 N.Y.2d·at 397, 469 N.Y.S.2d 655, 457 N.E.2d 761, which is not at issue here, while the *Blitz Corp.* and *Barr Co.* addressed situations where a plaintiff was able to provide sufficient independent evidence that one or more employees had committed dishonest acts. In sum, the insureds in these cases relied on the inventory shortage records or evidence solely to compute the degree of loss.

·Significantly, the referenced cases do not indicate that inventory exclusions are no longer enforceable, nor do the cases suggest the exclusion is unenforceable where no independent evidence of the loss is presented. Indeed, in *Maurice Goldman*, the New York Court of Appeals expressly found an exclusionary clause which included the language "loss or shortage disclosed on taking inventory" to be enforceable and unambiguous. *See* 80 N.Y.2d at 987, 592 N.Y.S.2d 645, 607 N.E.2d 792. A recent Illinois case refers to the "longstanding use" of the inventory shortages clause in the insurance industry. *See Reedy Indus., Inc.*, 240 Ill.Dec. 41, 715 N.E.2d at 732. Although declining to address the types of computations which fall within the exclusion, the court gives no indication that Illinois courts consider the language otherwise ambiguous. *See id.*

The exclusion provision here is not ambiguous and the Court must give the contract effect as written. *See Feltner v. D & H Impact Marketing Inc.*, No. 92 Civ. 4334, 1995 WL 476701, at *4 (S.D.N.Y. Aug.10, 1995)(citing *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir.1993)).

■ The dispute, therefore, is one of fact. The policy's exclusion pertains expressly to the situation where "the only evidence of the loss or damage is a shortage disclosed on taking inventory." The only proof of loss that plaintiff offers is Surgick's affidavit stating that plaintiff's principals first visually observed that a portion of its stock of FONECAPs was missing, and subsequently performed an inventory count to quantify the loss. In this version of events, the loss was not necessarily disclosed by the process of taking inventory, but merely confirmed and quantified. The earlier deposition. transcripts of the same principals, Marsh and Surgick, however, indicate that plaintiff only discovered the shortage when an employee performed an inventory count, and that there was nothing apparently unusual about the premises on the date in question to otherwise alert them that a theft had occurred. ·

■ The Court is mindful of the well-settled Second Circuit rule "that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987); *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997); *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995); *Sheriff's Silver Star Ass'n, Inc. v. County of Oswego*, 56 F.Supp.2d 263, 269 (N.D.N.Y.1999). This rule has traditionally been applied in the context of the non-movant's opposition to a motion for summary judgment, however, which is not the case here. Here a material issue of fact in the movant's own prior testimony contradicts the complaint and supporting affidavit. Nevertheless, given the inherently "increased level of reliability" of deposition testimony, *see Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir.1994), the Court cannot simply disregard plaintiff's earlier sworn testimony in favor of inconsistent post hoc statements prepared for purposes of this lawsuit.

Because plaintiff's legal argument is wholly dependent on a factual scenario wherein the plaintiff discovers its loss by means other than an inventory count, and prior testimony from its own affiants clearly demonstrates otherwise, at the very least a question·of fact has been raised warranting denial of plaintiff's motion for partial summary judgment. It should be noted that the police report stating that

"victim related to R/Os that upon arrival to the work place, victim observed that some of the merchandise that was produced was stolen" is ambiguous as to whether Marsh and/or Surgick visually observed that the FONECAPs were stolen prior to the inventory count. Because plaintiff has not established the absence of a question of fact as to whether the theft constitutes a "cause of loss" within the meaning of the policy, the denial of partial summary judgment is inclusive of plaintiff's claim for loss of business income.

Defendant's cross-motion for summary judgment on the breach of contract action must be granted. Even reading the police report in a light most favorable to plaintiff, it is not sufficient to raise a triable issue of fact as to whether Marsh or Surgick visually observed the loss prior to counting the inventory in light of their sworn testimony directly to the contrary.

### D. *Race Discrimination under 42 U.S.C. § 1981*

To analyze plaintiff's claim for race discrimination under section 1981, the Court applies the three-step burden-shifting process applied in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The first step in the *McDonnell Douglas* formulation requires plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination. *Id.* at 802, 93 S.Ct. 1817. After plaintiff makes this showing, the burden of production shifts to the defendant to establish a legitimate, nondiscriminatory reason for its conduct. *Id.* at 802–03, 93 S.Ct. 1817. Finally, plaintiff is afforded the opportunity to show that the reason stated by defendant was pretext. *Id.* at 804, 93 S.Ct. 1817.

■ In order to establish a *prima facie* case of discrimination under section 1981, plaintiff must allege facts showing (1) that plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (including the making or enforcement of a contract). *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). In the present case, defendant disputes only the second element, and plaintiff may be deemed to have sufficiently established the first and third.

" 'Essential to an action under Section 1981 are allegations that defendant's acts were purposefully discriminatory.' " *Dickerson v. State Farm Fire & Cas. Co.,* No. 95 Civ. 10733, 1997 WL 40966, at *3 (S.D.N.Y. Feb.3, 1997)(citing *Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988)), *aff'd,* 133 F.3d 906 (2d Cir.1997); *see also, Daniels v. City of Binghamton,* No. 95–CV–688, 1998 WL 357336, at *6 (N.D.N.Y. June 29, 1998) (plaintiff must allege that plaintiff's race was the motivating factor behind defendant's discriminatory acts). In order to "demonstrate an intent to discriminate, a plaintiff must allege facts sufficient to 'give rise to a plausible inference of racially discriminatory intent.' " *Dickerson,* 1997 WL 40966, at *3 (quoting *Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir.1994)).

■ While plaintiff's initial burden is relatively light, making "naked assertions that and setting forth no facts upon which a court could find" race discrimination will not withstand dismissal. *Yusuf,* 35 F.3d at 713; *see also Waldron v. Rotzler,* 862 F.Supp. 763, 769 (N.D.N.Y.1994) ("plaintiff must allege some facts that demonstrate that his race was the reason for the defendants' actions"). In a section 1981 contract discrimination action, facts necessary to create an inference of discrimination in the absence of allegations such as racial comments "include that plaintiffs fulfilled all of their obligations under the contract and that similarly situated non-minority people received the benefits of the contract which plaintiffs were denied." *Dickerson,* 1997 WL 40966, at *5; *Harris v. Allstate Ins. Co.,* 83 F.Supp.2d 423, 431–32 (S.D.N.Y.2000) (dismissing action for fail-

ure to allege specific allegations of race discrimination beyond "rank speculation" by insured that denial of claim was motivated by race).

■ Here plaintiff's only specific allegation of discrimination, aside from the fact its claim was denied, is the question De-Boer asked of the two principals, "No, I mean who is really in charge?" Plaintiff offers no other evidence in support of its conclusion. Plaintiff argues that this language, while not explicitly race-based, is sufficient to establish a plausible inference of racial discrimination because of its context. Plaintiff relies primarily on a case from the First Circuit, *Alexis v. Mc-Donald's Restaurants, Inc.,* 67 F.3d 341 (1st Cir.1995). In *Alexis,* a police officer removing an African–American plaintiff and her family from a restaurant stated, "You people have no rights. You better shut up your [expletive] mouth before I arrest you too." *Id.* at 346. Although the entire family was ordered to leave, the evidence showed that only one, at most, may have acted in a disorderly manner. *Id.* at 345–46. The court found that a factfinder could reasonably infer from the context of the statement that the officer harbored a racial animus sufficient to support a claim under 42 U.S.C. § 1981. *Id.* at 348.

The facts pleaded by plaintiff, even if accorded every favorable inference, are not sufficiently similar to the *Alexis* case to warrant a similar finding—particularly in light of the relevant Second Circuit case law referenced above. In the instant matter, not only is there no direct racial slur, but DeBoer made no reference to Marsh and Surgick in terms of a distinct class or people. Nor did DeBoer indicate that they should or would be mistreated for any reason (unlike the threat of arrest by the officer in the *Alexis* case). Finally, the context of DeBoer's alleged statement does not inevitably lead to a conclusion

that the statement referred to their race, and/or gender.[5]

In any event, plaintiff offers no evidence of any discriminatory comments or treatment by Spetz, the person to whom plaintiff's claim was transferred following plaintiff's written complaint, and who signed the letter denying plaintiff's claim. Indeed, plaintiff offers no facts tending to indicate that the reason defendant ultimately disclaimed coverage was the race of plaintiff's principals. The complaint contains no allegations that defendant's denial of plaintiff's claim in any way deviated from its standard practices due to Marsh and/or Surgick's race, nor any evidence that a white person would have received coverage under similar circumstances. *See Dickerson,* 1997 WL 40966, at *5–6; *Daniels,* 1998 WL 357336, at *6. Plaintiff has, therefore, failed to raise a plausible inference that defendant had the intent to discriminate on the basis of race when it denied plaintiff's insurance claim.

Even if the one comment by DeBoer in the context of the initial claims investigation were sufficient to raise a plausible inference of discriminatory intent in defendant's ultimate denial of coverage, plaintiff has provided no evidence which suggests that the legitimate reasons set forth by defendant for disclaiming coverage were merely pretextual. In sum, there is no material issue of fact as to whether defendant's denial of plaintiff's claim was racially motivated. Defendant's motion for summary judgment dismissing plaintiff's second cause of action must be granted.

### E. *Tort*

Plaintiff's allegations in the complaint that defendant's denial of coverage was racist and sexist do not set forth a cognizable claim in tort. In addition, the allegations "fail to justify an exception to the general rule that breach of contract does

---

**5.** Section 1981 applies to race discrimination only, and has no application to plaintiff's alle-

gations of gender discrimination.

not, by itself, give rise to a tort action." *Ivan Mogull Music Corp. v. Madison–59th Street Corp.,* 162 A.D.2d 336, 556 N.Y.S.2d 906 (1st Dep't 1990); *see also New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995)("where a party is merely seeking to enforce its bargain, a tort claim will not lie"). In this cause of action, the pleaded wrongful conduct, again, is defendant's denial of coverage to which plaintiff believes it was contractually entitled. Summary judgment dismissing plaintiff's third cause of action must also be granted.

### F. *Punitive Damages*

There exists no independent cause of action for punitive damages under New York law; punitive damages are a remedy. Since plaintiff's other three causes of action are to be dismissed, the punitive damages request cannot stand.

### IV. *CONCLUSION*

Defendant has shown there is no genuine issue of material fact that its disclaimer of coverage was consistent with the terms of the policy, and not in breach thereof. Defendant has also demonstrated that there is no genuine issue of material fact regarding whether its disclaimer was motivated by plaintiff's race, and plaintiff has failed to plead a cognizable claim in tort on these facts as well.

Accordingly, it is

ORDERED that

1. Plaintiff's motion for partial summary judgment is DENIED; and

2. Defendant's motion for summary judgment is GRANTED and the complaint is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.