CAMBRIDGE TRUST COMPANY *vs.* COMMERCIAL UNION
INSURANCE COMPANY.

No. 90-P-1300.

Suffolk. February 12, 1992. - May 22, 1992.

Present: BROWN, KASS, & LAURENCE, JJ.

*Insurance*, Embezzlement, Bond, Interest. *Evidence*, Prior misconduct,
Relevancy and materiality. *Practice, Civil*, Severance, Instructions to
jury, Interest. *Embezzlement.*

In an action on a fidelity bond, where a bank asserted a single claim of loss
by embezzlement, the judge properly denied the insurer's motions seek-
ing to exclude some of the evidence of embezzlement and seeking a
separate trial with respect to some of the evidence. [564-565]
In an action on a fidelity bond, the judge correctly denied the defendant's
motions for a directed verdict and for judgment notwithstanding the
verdict where the evidence of embezzlement by an employee was suffi-
cient to submit the case to the jury; further, the judge correctly denied
the defendant's motion for new trial based on a claim of insufficiency of
the evidence. [565-567]
In a civil action based on the wrongful refusal of an insurer to a pay a
claim, the judge properly awarded prejudgment interest under G. L. c.
231, § 6C, and court costs under G. L. c. 261, § 1. [567-568]
At the trial of a civil action there was no error in the jury instructions or
the timing of the judge's giving the jury certain limiting instructions.
[568-569]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 8, 1985.

The case was tried before *Barbara J. Rouse*, J., and a mo-
tion for a new trial was heard by her.

*David A. Grossbaum* for the defendant.

*Peter S. Terris* for the plaintiff.

KASS, J. As a result of manipulation by an employee of its
check proofing and transit system, the plaintiff Cambridge
Trust. Company (the bank) claims to have lost $187,125.
Commercial Union Insurance Company (CU), which had is-

sued to the bank a form of fidelity bond called a financial institutions bond, paid only $14,703[1] on the bond. That amount CU acknowledged as stolen; the balance of the loss it ascribed to the bank's carelessness. The bank brought an action on its contract with CU and obtained a jury verdict of $128,050, to which the trial judge added $10,516 in court costs, plus statutory interest.

On its appeal, CU protests that evidence of the acts of the conceded embezzlement ought not to have been received to reinforce evidence of the contested losses. There are variations on that theme: that the judge should have allowed a motion for separate trials for differing kinds of acts of embezzlement; that the jury ought to have been instructed to limit the use of the strongest evidence; and that without evidence of the conceded $14,703 theft, there was insufficient evidence to take the balance of the claim to the jury. CU also argues that under the language of its bond, it was not liable for court costs and prejudgment interest. We affirm the judgment.

Taking the evidence in the light most favorable to the plaintiff, the jury could have found as follows. The central figure in the plot was Elnora Stanford Yard, the supervisor of the proof and transit department at the bank. That department recorded and forwarded to corresponding banks all checks which the bank took in as deposits or which it cashed. An employee in the department would put a bundle of checks through a proof machine which encoded the amount of the check on the bottom of the original and simultaneously generated a tape which listed the check amounts. The checks were then put through a microfilm machine which made copies in the same order that the checks traveled through the proof machine. The checks and the tape were then sent to the Shawmut Bank (Shawmut) or the Federal Reserve Bank, as a correspondent bank for collection.

Among the manifestations of her industry and devotion to duty (which her employer did not fail to notice) was Yard's

---

[1]Amounts have been rounded off to the nearest dollar.

willingness to let the employees she supervised go home while she stayed into the evening to finish dealing with the day's traffic of checks. Her method of defalcation was to write checks on an account she had opened at the Shawmut, either to cash or to stores whom she knew to be customers of the bank. As those checks came through Yard's proofing and transit department, she would pluck them out of a batch of checks before forwarding that batch to the Shawmut. Thus, Yard's checks did not reach the point where they would be charged to her account.

More was required, however, to keep the scheme from unravelling. The corresponding bank, in this case the Shawmut, would notice that the tape itemizing the checks purportedly sent over did not correspond with the checks actually forwarded and would inform Cambridge Trust of the missing check or checks. It was then Yard's duty to locate the missing check in the film log, make a copy of it and resubmit it. As to checks of hers, she did not do that; instead she made out a general ledger credit ticket to clear the item and charge it to the bank. Yard's authority to make out general ledger tickets was limited to checks she had found and in fact resubmitted to a corresponding bank. If an item were to be cleared because the underlying check appeared to have been irrevocably lost, the authority so to do rested with the controller or assistant controller.

In addition to Yard's own checks which never made it to the Shawmut (totalling $14,703), bank auditors found films of $7,602 worth of checks, written by others, which similarly failed to arrive at the Shawmut. There was another category of checks that appeared on the proof machine tapes but were not transmitted to the Shawmut. As to those checks, Yard had signed general ledger tickets aggregating $60,781. A fourth category involved checks which had been through the proof machine, had not been filmed, but as to which there seemed not to be individual ledger tickets. Rather, bundles of checks were apparently covered by single ledger tickets. Into that category fell $26,918 worth of checks. Description of five other categories of irregularities laid at Yard's feet

would assist the reader only marginally. It may be sufficient to say that an additional $55,897 was involved.

1. *The contagion effect of certain evidence.* CU sought consistently, by a motion in limine and motions for separate trials, to exclude the most potent evidence of Yard's thefts — that which related to the category totalling $14,703.[2] CU advances two arguments in support of its position: (1) that proof of prior bad acts should not be used to shore up proof of other bad acts; and (2) that separate trials should be granted when proof of one set of acts is so prejudicial that it cannot help but spill over to persuading the jury about other criminal acts.

Ordinarily, evidence of an earlier wrongful act may not be introduced solely to prove a propensity on the part of the defendant for a particular kind of conduct. *Davidson* v. *Massachusetts Cas. Ins. Co.*, 325 Mass. 115, 122-123 (1949). *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 188 (1990). Liacos, Massachusetts Evidence 420 (5th ed. 1981). When, however, the purpose is to show the defendant's activity in a common scheme, such as sequential and similarly patterned acts of embezzlement, evidence of the prior bad act is admissible. *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986). *Commonwealth* v. *Fleury-Ehrhart*, 20 Mass. App. Ct. 429, 430-431 (1985). That would have justified receiving evidence about Yard's manipulation of the $14,703 of her personal checks if they had been *prior* acts, but it is more to the point that the evidence does not establish a temporal order to the particular acts of embezzlement of which there was the most convincing proof. The check manipulations involved with the $14,703 did not precede the other acts of embezzlement alleged by the bank; they were interspersed with them. CU's prior bad acts argument, therefore, rests on a mistaken premise and has no merit.

The invalidity of CU's request for separate trials is first exposed by recognizing that no trial at all was necessary as to the acts which resulted in $14,703 worth of theft if CU, as

---

[2] Yard pleaded guilty to a theft in that amount in a criminal proceeding against her.

it now insists, conceded them. Seen for what it was, the purpose of the motion for separate trials was simply another way of avoiding the effect of the evidence which proved most persuasively that Yard had manipulated checks in the department she supervised so as to produce gain for herself and loss for the bank. In any event, it would be a remarkable doctrine which required that strong evidence be reserved for one trial and weaker evidence for another. Trial judges have discretion to separate parties, claims, and issues in order to avoid prejudice or in the interest of expedition and economy. Mass.R.Civ.P. 42(b), 365 Mass. 805 (1974). *Dobos* v. *Driscoll*, 404 Mass. 634, 644-645, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989). *Roddy & McNulty Ins. Agency, Inc.* v. *A.A. Proctor & Co.*, 16 Mass. App. Ct. 525, 528-529 (1983). There are not separate parties, claims, or issues in this case. The bank has asserted a single claim of loss and its components are related, involving the same department of the bank and the same player in it. Separation would have been highly artificial.

2. *Sufficiency of the evidence.* In support of its position that the trial judge erred in denying its motions for a directed verdict, judgment notwithstanding the verdict, and for a new trial, CU makes esssentially the same argument: proof of $14,703 in theft could not prove an additional $113,347 in thefts which the jury attributed to Yard.[3] If the evidence were only of Yard's $14,703 in theft and that an additional $113,347 was missing, there would be merit to CU's position. That the bank lost more than $14,703 does not, by itself, serve to prove that the additional loss occurred as a consequence of Yard's defalcations. See *Prager & Bear, Inc.* v. *Federal Ins. Co.*, 66 Cal. App. 3d 970, 978 (1977); *Lipman Bros.* v. *Hartford Acc. & Indem. Co.*, 149 Me. 199, 216-217 (1953); *Danal Jewelry Co.* v. *Fireman's Fund Ins. Co.*, 107 R.I. 33, 41 (1970). We test, then, whether the evidence permitted the drawing of reasonable inferences that Yard had been responsible for losses beyond the $14,703. See *Interna-*

---

[3]The jury returned a verdict of $128,050. If $14,703 is subtracted from that figure, the result is $113,347.

*tional Totalizing Sys.* v. *PepsiCo., Inc.,* 29 Mass. App. Ct. 424, 429 (1990), and cases there cited, which state the standards for reviewing the disposition of motions for a directed verdict and for judgment notwithstanding the verdict.

There was more to the bank's case than evidence only of how the $14,703 had been embezzled and that other losses had occurred while Yard was employed by the bank. Robert McDonald, the bank's controller, testified to: Yard's unauthorized issuance of general ledger tickets; her responsibility for the film log; that portions of the film log were missing; that she had made some $166,000 of unauthorized cash letter adjustments improperly; that she would dismiss her staff before work was completed and complete work alone; and that shortly before she left her job in February, 1984, Yard had processed checks totalling $187,125 through the proof machine twice to conceal accumulated losses.

Mark Quinn, a partner with the accounting firm of Ernst and Young, gave testimony as an expert in banking systems which included the following: (1) the number of missing film items was higher than normal, i.e., higher than simple error rate; (2) the double-processing of a batch of checks worth $187,000 concealed earlier manipulations; (3) a large number of delays in the clearing process indicated manipulation rather than normal operation; (4) the use of general ledger tickets was inconsistent with normal operations; (5) Yard's initials were present on general ledger tickets; and (6) Yard was present and in charge when losses traceable to her department had occurred. From that combination of facts, Quinn identified Yard as the person who consciously manipulated records in her department so as to cause cash to be paid for checks and the underlying checks to disappear.

This was sufficient to take the case to the jury. The evidence was circumstantial, but, in embezzlement cases as in arson cases, that is likely to be the character of the evidence. See *Banco de San German, Inc.* v. *Maryland Cas. Co.,* 344 F. Supp. 496, 507-508 (D.P.R. 1972); *Lovas* v. *St. Paul Ins. Co.,* 240 N.W.2d 53, 60-61 (N.D. 1976). Fidelity bonds frequently contain language which excludes loss proved only by

an inventory computation or a profit and loss computation. See, e.g., *Popeo* v. *Liberty Mut. Ins. Co.*, 369 Mass. 781, 782-784 (1976); *Prager & Bear, Inc.* v. *Federal Ins. Co.*, 66 Cal. App. at 974; *Gotcher Engr. & Mfg. Co.* v. *United States Fid. & Guar. Co.*, 193 So. 2d 115, 116 (Miss. 1966); *Locke Distrib. Co.* v. *Hartford Acc. & Indem. Co.*, 407 S.W. 2d 658, 660 (Mo. 1966); *Teviro Casuals, Inc.* v. *American Home Assur. Co.*, 81 A.D.2d 814, (N.Y. 1981); *Jones* v. *Employers Mut. Cas. Co.*, 230 Neb. 549, 556-558 (1988). There is considerable disparity of opinion among courts as to the potency of the collateral evidence needed to overcome that type of exclusion, although the tendency, see *Prager & Bear, Inc.* v. *Federal Ins. Co.*, 66 Cal. App. 3d at 976-977, has been toward the acceptance of evidence of dishonest acts of employees, coupled with shortfall, as amounting to more than mere "inventory computation." Proof of relevant improprieties by an employee may serve to corroborate that an inventory loss is the consequence of that employee's infidelity. This has been the view taken in Massachusetts. *Popeo* v. *Liberty Mut. Ins. Co.*, 369 Mass. at 784. The financial institutions bond which CU furnished to the bank did not contain an analog to the "inventory computation" exclusion; therefore the evidence of Yard's misconduct, coupled with the evidence of loss in the proof and transit department, is all the more easily acceptable as sufficient to place before the jury the question whether Yard was responsible for all of the loss claimed by the bank. The motions were rightly denied.

3. *Prejudgment interest and court costs.* CU protests the inclusion in the final judgment of statutory prejudgment interest (G. L. c. 231, § 6C), calculated at twelve percent per year from the time of breach or demand, on the ground that the bond does "not cover . . . potential income, including but not limited to interest and dividends, not realized by the insured." We read the limitation in the bond as referring to interest which might have been earned on the stolen money between the time of the theft, to the extent ascertainable, and presentation to the insurer of a proof of loss.

The exclusion does not refer to the period between wrongful refusal by an insurer to pay a proper claim and ultimate recovery after litigation. Rather, the purpose of the exclusion is to define the loss. *Oritani Sav. & Loan Assn.* v. *Fidelity Deposit Co.*, 744 F. Supp. 1311, 1319 (D.N.J. 1990). Prejudgment interest serves to compensate for the loss of use of money wrongfully withheld. *Perkins Sch. for the Blind* v. *Rate Setting Commn.*, 383 Mass. 825, 835 (1981). *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 841 (1986). It is one thing for an insurer to define what losses it covers, quite another to attempt to neutralize what the State has declared a defendant is to pay by reason of its unlawful conduct. See *First Am. State Bank* v. *Continental Ins. Co.*, 897 F.2d 319, 327-328 (8th Cir. 1990); *Oritani Sav. & Loan Assn.* v. *Fidelity Deposit Co.*, 744 F. Supp. at 1319.

The same reasoning applies to CU's attack upon the $10,516 in court costs (largely for expert witness fees) awarded (under G. L. c. 261, § 1) to the bank. There is an exclusion in the bond pertaining to "costs, fees and other expenses incurred by the insured in establishing the existence of or amount of loss covered under this bond." Such costs and fees would include the audits and investigations necessary to establish a loss so that a claim can be made under the bond. The provision does not apply to costs incident to vindicating rights of an insured under the bond after the insurer has refused to perform on its contract.

4. *Jury instructions.* When the evidence about the most demonstrable thefts began to be introduced, CU requested a cautionary instruction that the jurors not view that evidence as indicating a propensity on the part of Yard to steal. The judge declined to instruct the jury at that time and said she would instruct the jury to that effect in her final charge, before they retired to deliberate. Regarding the timing of cautionary or limiting instructions, a trial judge has discretion. *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 748 (1975). There was no error in leaving the subject to final instructions.

In her final charge, the judge instructed the jury that the $14,703 in conceded theft "is not in and of itself sufficient to prove the plaintiff's claim. You may not on the basis of that conclude that Ms. Yard stole the remaining amounts of money in dispute solely because she had demonstrated a propensity or a likelihood to steal." The judge emphasized the point by promptly restating it. In a supplementary instruction requested by the bank, the judge told the jurors they could, however, consider the conceded thefts as relevant and probative generally to the bank's claim that Yard had manipulated records for the purpose of depriving the bank of money and concealing that act from the bank. The judge's instructions put the case to the jury correctly — certainly without undue emphasis about the weight to be accorded the $14,703 in defalcations.

*Judgment affirmed.*
*Order denying motion for*
*new trial affirmed.*