NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-112

TONGDA FRUIT JUICE AND BEVERAGE LIQUAN CO., LTD. & others[1]

vs.

SONO INTERNATIONAL, LTD.[2] & others;[3] HENGTONG JUICE USA INC. & others,[4] defendants-in-counterclaim.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This case concerns a business dispute between a group of affiliated apple juice concentrate producers known as Hengtong[5] and a purchaser of Hengtong's products, Steinhauser, Inc. (Steinhauser).  After Steinhauser failed to pay for product

---

[1] Shaanxi Hengtong Fruit Juice & Beverage Group Co., Ltd.; Shaanxi Hengxing Fruit Juice Co., Ltd.; and Gansu Tongda Fruit Juice & Beverage Co., Ltd.

[2] Doing business as Sono Global.

[3] Steinhauser, Inc. and Darren Jenkins.

[4] Binder International GMBH & Co KG, Binder International of Boston LLC, Peter Chakiris, and Thomas Nothelfer.

[5] Where the distinction between any of the Hengtong affiliates is immaterial to our discussion, we refer to all the Hengtong affiliates interchangeably as "Hengtong."

delivered under various contracts, Hengtong brought suit against Steinhauser, Steinhauser's parent company, Sono International, Ltd. (Sono), and a Steinhauser employee named Darren Jenkins. Steinhauser counterclaimed against Hengtong for civil conspiracy, aiding and abetting, and violation of G. L. c. 93A.[6] A Superior Court judge bifurcated Hengtong's claims from Steinhauser's counterclaims, and Hengtong's claims proceeded to a jury-waived trial before another Superior Court judge.[7] The trial judge found Steinhauser and Sono liable for breach of contract, Sono liable for violation of G. L. c. 109A, and all of the defendants liable for violation of G. L. c. 93A. Thereafter, a third Superior Court judge entered summary judgment in Hengtong's favor on Steinhauser's counterclaims. After a judgment entered, Steinhauser and Jenkins appealed.[8] We affirm.

---

[6] Steinhauser also asserted claims against several additional defendants-in-counterclaim, including another Hengtong affiliate. With the exception of the Hengtong affiliate, Steinhauser stipulated to the dismissal of its claims against the additional defendants-in-counterclaim.

[7] As we explain, the trial was interrupted by the COVID-19 pandemic. The judge heard some of the testimony in person prior to the start of the pandemic and some of the testimony by video months later.

[8] Sono did not appeal.

1.  Background.  a.  Hengtong's claims.  We recite the following facts as found by the trial judge.  See Cummings Props., LLC v. Hines, 492 Mass. 867, 868 & n.3 (2023).[9]

Hengtong is a group of Chinese companies that make and sell apple juice concentrate.  Steinhauser, which was acquired by Sono in 2012, was a Massachusetts-based company that purchased and sold fruit juice products.  Jenkins, a resident and citizen of the United Kingdom, was a director of Steinhauser and Sono.

Steinhauser mostly dealt in "back-to-back" sales where (1) a client would reach out to Steinhauser for a certain amount of product and (2) Steinhauser would negotiate its purchase and resale of the product at the same time, thereby guaranteeing that Steinhauser would get paid.  For many years, Hengtong was one of Steinhauser's largest suppliers.  However, that relationship came to an end in 2017 after Steinhauser failed to pay Hengtong approximately $3.4 million on four contracts for back-to-back sales that Steinhauser and Hengtong entered into between November 2016 and January 2017.  At trial, there was no dispute that Steinhauser breached the contracts by not paying Hengtong.  The parties' dispute instead centered on whether

_____

[9] The trial judge's decision included over fifty pages of detailed findings.  With one minor exception, which we note, infra, Steinhauser and Jenkins do not argue that any of those findings were clearly erroneous.

3

Steinhauser acted unfairly toward Hengtong.  Accordingly, we describe in some detail the manner in which Steinhauser operated its business.

Beginning in September 2015, Steinhauser funded its business operations primarily through a $30 million revolving line of credit from East West Bank (EWB).  The line of credit (EWB loan) contained covenants requiring Steinhauser to receive EWB's "prior written consent" before making "any loans or advances," "[i]nvestments," or "transaction[s] with any . . . [a]ffiliate . . . on terms any less favorable than those which might be obtained at the time from [p]ersons who are not such an . . . [a]ffiliate."  However, Steinhauser knew that "unless and until EWB objected and enforced the covenants in the loan documents, the EWB loan to Steinhauser presented an opportunity . . . to move cash in related-party transactions" among the various affiliates of Steinhauser's parent company, Sono.

In 2016, using funds from the EWB loan, Steinhauser began making prepayments to Sono affiliates for juice products.[10] Steinhauser did so to diversify its product base and minimize

---

[10] Prepayments in the juice industry are standard.  As a general matter, prepayments are often necessary so that farmers have funds to plant, harvest, and deliver fruit.  Industry standard calls for buyers and sellers to memorialize prepayment transactions with written contracts that include terms regarding delivery deadlines.

its reliance on Hengtong. However, Steinhauser also did so without entering into written contracts or obtaining enforceable commitments for delivery. In addition, Steinhauser's prepayments to Sono affiliates were made without EWB's approval, in violation of the EWB loan covenants. Steinhauser also used funds from the EWB loan, without EWB's consent and in violation of the EWB loan covenants, to loan over $2 million to a Sono affiliate for the purchase of a juice factory in Brazil called Cajuba (Cajuba loan).[11]

Even though Steinhauser repeatedly violated the EWB loan covenants, EWB agreed on multiple occasions to forbear from seeking full payment. With respect to the Cajuba loan in particular, EWB informed Steinhauser in early 2017 that it deemed the investment a violation of the EWB loan covenants. However, EWB agreed to forbear from seeking full payment on the conditions, among others, that (1) Steinhauser obtain repayment of the Cajuba loan by May 30, 2017, and (2) Steinhauser use those funds to reduce the outstanding principal balance of the EWB loan by $2.37 million. EWB later extended the May 30, 2017, deadline to July 31, 2017. Although Steinhauser never obtained repayment of the Cajuba loan, Steinhauser did reduce the

---

[11] Steinhauser initially provided the money as an equity investment. For purposes of our discussion, we need not dwell on why and how the investment became a loan.

outstanding principal balance of the EWB loan by $2.37 million shortly after the July 31, 2017 deadline.

By August 2017, Steinhauser (through Jenkins) knew that EWB would not continue to "forbear for long" and that EWB was likely to terminate the loan, which would make it impractical for Steinhauser to stay in business.[12]  Indeed, faced with Steinhauser's repeated violations of the EWB loan covenants, EWB notified Steinhauser on September 12, 2017, that it was terminating the EWB loan.[13]  The termination of the EWB loan spelled Steinhauser's demise.

It is against this backdrop that Hengtong's dispute with Steinhauser arose.  In 2016, Steinhauser began to accrue a

_____

[12] The trial judge found that Jenkins, specifically, knew that EWB was likely to terminate the loan and that Jenkins knew that termination of the loan would make it impractical for Steinhauser to stay in business.  Jenkins testified otherwise, but the trial judge did not credit that testimony and found that Jenkins, as an experienced businessperson with full knowledge of Steinhauser's repeated violations, knew the consequences of Steinhauser's failure to meet the EWB deadline.

[13] The trial judge found that Steinhauser's misuse of the EWB loan "caused termination of that loan."  Steinhauser and Jenkins argue that this finding was clearly erroneous, but it was supported by an e-mail message from EWB to Steinhauser stating that EWB would not "be in a position to further amend the forbearance agreement" if Steinhauser did not replace the funds used to make the Cajuba loan.  Although Steinhauser and Jenkins point to other evidence, obtained after trial, showing that EWB cited Steinhauser's weak financial performance as the official reason for terminating the EWB loan, we cannot say on the record before us that the judge's finding was clearly erroneous.

6

large, unpaid balance with Hengtong. Despite Steinhauser's unpaid balance, Hengtong did not consider withholding contracts from Steinhauser given their longstanding business relationship. Thus, from November 2016 to January 2017, Steinhauser and Hengtong entered into the four contracts for back-to-back sales mentioned above. At the same time, Hengtong pressed Steinhauser to pay the overdue amounts, and the two companies entered into payment plans in January and May 2017 to reduce Steinhauser's unpaid balance. Based on Steinhauser's representations that it would pay, Hengtong shipped product to Steinhauser pursuant to the four back-to-back contracts. Steinhauser's representations were misleading because (1) Steinhauser's ability to pay depended on its receipt and sale of the juice products from Sono affiliates for which Steinhauser had prepaid and (2) receipt of that product was unrealistic where Steinhauser had not set enforceable delivery commitments. Because of payment delays, Hengtong stopped shipping product to Steinhauser in June 2017.

Thereafter, at a time when Steinhauser remained in debt to Hengtong and Steinhauser's demise was imminent and expected given the realities of the EWB loan, Steinhauser continued making prepayments to Sono affiliates. As the trial judge found, "[t]he supposed justification [for the prepayments] -- anticipated receipt of product after the growing season -- was pretextual in a context where Steinhauser's demise was imminent

7

and expected."  Rather, the prepayments were intended to defraud Hengtong.

At all relevant times, Jenkins was the "major decision maker" for Steinhauser.  Although Jenkins resided in the United Kingdom, he directed Steinhauser's operations through electronic and oral communications with Steinhauser employees located in Massachusetts.  Among other things, Jenkins directed employees to (1) make the prepayments to Sono affiliates and (2) enter into the payment plans with Hengtong.

b.  Steinhauser's counterclaims.  As noted, Steinhauser counterclaimed against Hengtong for civil conspiracy, aiding and abetting, and violation of G. L. c. 93A.  These counterclaims were based on allegations that Hengtong helped a former Steinhauser consultant, Thomas Nothelfer, and a former Steinhauser employee, Peter Chakiris, divert business to a competing business named Binder International of Boston LLC (Binder).[14]  Where Steinhauser's counterclaims were dismissed on summary judgment, we construe the facts from the summary judgment record in the light most favorable to the nonmoving party, here Steinhauser.  See Cesso v. Todd, 92 Mass. App. Ct. 131, 132 (2017).

---

[14] Steinhauser also asserted claims against Nothelfer, Chakiris, and Binder, but Steinhauser stipulated to the dismissal of those claims.

Nothelfer worked for Steinhauser under a consulting agreement. Nothelfer served as the president of Steinhauser until September 6, 2016, and as a consultant until March 31, 2017, when he left the company. Nothelfer's consulting agreement did not contain any express noncompetition or nonsolicitation covenants. Chakiris worked for Steinhauser under an employment agreement until February 28, 2017, when he left the company. Chakiris's employment agreement included covenants not to compete with Steinhauser or to solicit Steinhauser's clients while employed by Steinhauser and for one year thereafter. However, when Chakiris resigned, Steinhauser agreed to relieve him of the noncompetition covenant and to amend the nonsolicitation covenant. As amended, the nonsolicitation covenant prohibited Chakiris only from soliciting certain clients for six months. After leaving Steinhauser, Nothelfer and Chakiris both worked for Binder.

In December 2016, while Nothelfer and Chakiris were working for Steinhauser, Nothelfer learned that one of Steinhauser's clients wanted to make a large purchase of Hengtong's products through Steinhauser. Nothelfer provided this information to Binder so that Binder could make an offer for the client to purchase the product through Binder instead. Nothelfer also arranged a meeting with Hengtong "to explain everything . . . in the quiet." After Nothelfer met with Hengtong, Hengtong

9

conveyed to the client a preference for working with Binder, and the client placed its order through Binder.

In March 2017, while Nothelfer was still consulting for Steinhauser but after Chakiris had left, Nothelfer obtained information regarding an offer that Steinhauser was making to another client.  Nothelfer gave the information to Chakiris, who reverse engineered the offer so that Binder could make a lower offer of its own.  Again, Hengtong supported Binder's offer, and the client placed its order through Binder.

2.  Discussion.  a.  Bifurcation.  First, we review the decision to bifurcate Hengtong's claims from Steinhauser's counterclaims.  Reviewing for abuse of discretion, see Cambridge Trust Co. v. Commercial Union Ins. Co., 32 Mass. App. Ct. 561, 565 (1992), we discern none.  Rule 42 (b) of the Massachusetts Rules of Civil Procedure permits judges to order separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Mass. R. Civ. P. 42 (b), as amended, 423 Mass. 1402 (1996). Here, the claims and counterclaims related to different commercial transactions.  Hengtong's claims concerned Steinhauser's decision to funnel money to various Sono affiliates instead of paying Hengtong for product that Steinhauser had already received.  Steinhauser's counterclaims concerned Hengtong's decision to stop selling product to

10

Steinhauser and, instead, to start selling the same product to Binder. In this context, the claims and counterclaims involved different evidence, and bifurcation was within "the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Steinhauser and Jenkins argue prejudice resulting from the bifurcation -- i.e. that they should have been able to introduce evidence at trial showing that Steinhauser was still trying to win contracts in late 2016 and early 2017 and that Hengtong improperly diverted that business to Binder. Steinhauser and Jenkins suggest that this evidence related to whether both Steinhauser and Hengtong knew or should have known that Steinhauser would be unable to pay pursuant to the payment plans. The argument is unpersuasive because it assumes that Steinhauser would have been able to pay had it won the contracts. As the trial judge found, however, Steinhauser's ability to pay hinged on its receipt and resale of the juice products from Sono affiliates for which Steinhauser had prepaid. That finding is supported by the record and we thus discern no error.

b. COVID-19 pandemic. Second, we review the decision to hold some of the trial by video, and briefly describe the timeline of events leading up to that decision. On March 5 and 13, 2020, the trial judge heard the direct examination of

Hengtong's main witness and part of his cross-examination in person. Then, the COVID-19 pandemic closed the courts and the trial was suspended. The trial judge initially waited to see if the trial could be resumed in person. By June 2020, it still was not possible for the parties to hold the trial in person, and Hengtong presented the remainder of its case-in-chief in June and July 2020 via video. However, because all of the defendants -- Steinhauser, Sono, and Jenkins -- objected to proceeding by video, the trial judge waited an additional four months, until October 2020, before requiring Steinhauser, Sono, and Jenkins to present their defense by video.

By the time the trial judge required Steinhauser, Sono, and Jenkins to proceed by video, an order of the Supreme Judicial Court explicitly permitted "[c]ivil bench trials [to] be conducted virtually in the discretion of the judge." See Third Updated Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic, No. OE-144 (June 24, 2020), https://www.mass.gov/doc/repealed-sjc-third-updated-order-regarding-court-operations-under-the-exigent-circumstances/download [https://perma.cc/5K7R-27AT]. In light of the timeline of events described above, we discern no abuse of the trial judge's discretion. Rather, it is evident that the trial judge proceeded cautiously and resorted to holding the remainder of the trial by video only after there had

12

been a significant delay. As the trial judge explained, waiting to resume the trial in person would have "provide[d] little or no benefit and would [have] [led] to a delay of unknown, but undoubtedly great, length."[15]

    c. Violation of G. L. c. 93A. Next, Jenkins argues that the trial judge erred in finding him liable under G. L. c. 93A, § 11 because "the actions and transactions constituting . . . the unfair or deceptive act or practice" did not meet § 11's requirement of occurring "primarily and substantially" in Massachusetts.[16] We disagree.

---

[15] Steinhauser and Jenkins argue that the hybrid approach was fundamentally unfair because the judge benefited from hearing Hengtong's main witness in person but did not hear any of the defendants' witnesses in person. However, the trial judge stated that he "saw no material advantage, if any at all, in judging credibility or assessing demeanor through live remote testimony in this case." See Vazquez Diaz v. Commonwealth, 487 Mass. 336, 342 (2021) ("Although generally not preferable, with today's video conferencing technology, a virtual hearing can approximate a live physical hearing in ways that it could not previously"). The trial judge further stated that any advantage to hearing the in-person testimony had "dissipated" during the delay in the proceedings. The trial judge explained that, given the delay, he reviewed the recording of in-person testimony and that the recording was fresher in the judge's mind than the in-person testimony. The trial judge's reasoning and his review of the in-person testimony reflect a thoughtful approach to unprecedented circumstances.

[16] Whether conduct rises to the level of a G. L. c. 93A violation and whether the circumstances that gave rise to a c. 93A claim occurred primarily and substantially in Massachusetts are questions of law. See H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 14 (2022); Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 470

13

As detailed in the trial judge's comprehensive findings, Jenkins, as Steinhauser's "major decision maker," controlled a course of action whereby Steinhauser (1) made prepayments to Sono affiliates on lax conditions that jeopardized Steinhauser's timely receipt of product and the EWB loan, (2) entered into payment plans with Hengtong without disclosing that Steinhauser's ability to pay depended on receiving product from Sono affiliates, which was unlikely, and (3) when everything inevitably came crashing down, continued making prepayments to Sono affiliates instead of paying Hengtong. Hengtong, which was unaware of Steinhauser's financial distress, shipped product to Steinhauser in reliance on the payment plans. Jenkins's conduct, at the very least, was akin to the sort of "stringing along" conduct that has been found actionable under G. L. c. 93A. See Connor v. Marriott Int'l Inc., 103 Mass. App. Ct. 828, 835 (2024).

As to whether "the actions and transactions constituting . . . the unfair or deceptive act or practice occurred primarily and substantially" in Massachusetts, G. L. c. 93A, § 11, the test does not turn on any specific factor, see Kuwaiti Danish

---

(2003). We accept the trial judge's subsidiary factual findings absent clear error but review the ultimate legal conclusions de novo. See H1 Lincoln, Inc., supra at 13-14; Kuwaiti Danish Computer Co., supra.

14

Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 473 (2003). Rather, "a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Id. We focus on the context of the entire claim, not just on where the actions and transactions complained about occurred. See Auto Shine Car Wash Sys., Inc. v. Nice 'N Clean Car Wash, Inc., 58 Mass. App. Ct. 685, 689 (2003).

In arguing that the center of gravity of the circumstances is not primarily and substantially in Massachusetts, Jenkins notes that he is a resident and citizen of the United Kingdom who never visited Massachusetts in connection with the four contracts at issue. This narrow argument focuses on Jenkins's location without addressing the fact that Jenkins orchestrated an unfair scheme that was carried out, at his direction, in Massachusetts. See Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass. App. Ct. 302, 311 (1988) (argument improperly looked at one act of deception in isolation). Jenkins did so by directing employees who were working in Massachusetts for a Massachusetts-based company to take actions in Massachusetts. Thus, despite Jenkins's location in the United Kingdom, the "center of gravity of the circumstances that

15

give rise to the claim is primarily and substantially" in Massachusetts.  Kuwaiti Danish Computer Co., 438 Mass. at 473.  Contrast Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 638 (1985) ("alleged representations made during a telephone call or calls" between corporate officer of defendant in Massachusetts and plaintiff in New York did not occur primarily in Massachusetts within meaning of c. 93A).

    d.  Summary judgment.  Lastly, Steinhauser argues error in the dismissal of its counterclaims against Hengtong on summary judgment.  As noted, Steinhauser's counterclaims were based on the idea that Hengtong, in supporting Binder's offers, assisted Nothelfer and Chakiris in violating fiduciary duties owed to Steinhauser.[17]  To defeat summary judgment on these claims, Steinhauser had to point to some evidence in the record showing

---

[17] It is undisputed that Hengtong did not have an exclusivity agreement with Steinhauser and, ordinarily, would have been free to sell its products through any company of its choosing.  Thus, whether Hengtong engaged in wrongdoing turns on whether Nothelfer and Chakiris owed any fiduciary duty to Steinhauser and whether Hengtong participated in a civil conspiracy or aided and abetted Nothelfer and Chakiris in breaching their fiduciary duties when they solicited clients to purchase Hengtong's products through Binder instead of Steinhauser.  At least with respect to Nothelfer, who ceased being Steinhauser's president in September 2016 and who worked pursuant to a consulting agreement that did not include any noncompetition or nonsolicitation provisions, we express doubt that he owed any fiduciary duty to Steinhauser at the time of the alleged wrongdoing.  Regardless, we assume for purposes of our review that Nothelfer did owe such a duty to Steinhauser.

16

that, among other things, Hengtong had "specific knowledge" of the alleged wrongdoing on the part of Nothelfer and Chakiris. Kyte v. Philip Morris Inc., 408 Mass. 162, 168-169 (1990). Evidence showing that Hengtong had a "general awareness" that Nothelfer and Chakiris may have been violating fiduciary duties owed to Steinhauser is insufficient to defeat summary judgment. Id. See Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 91 Mass. App. Ct. 835, 847-848 (2017) (claims for civil conspiracy and aiding and abetting breach of fiduciary duty require showing that defendant knew of breach).

Here, the summary judgment record does not contain evidence from which one could reasonably infer that Hengtong had specific knowledge of any fiduciary duties that Nothelfer and Chakiris were violating in December 2016 and March 2017. The evidence showed that (1) Nothelfer did not disclose to Hengtong any of the terms of his consulting agreement with Steinhauser and (2) while Chakiris eventually told Hengtong that he could not "talk to certain customers,"[18] he did not disclose that, more generally, he could not solicit certain clients. In arguing that Hengtong's knowledge was greater than this, Steinhauser points to e-mail messages from Nothelfer to Hengtong in January

---

[18] The record is unclear as to precisely when this disclosure occurred, but it occurred sometime after Chakiris started working for Binder.

17

and February 2017 saying that he was "[n]ot released so far from Steinhauser" and asking Hengtong to communicate with him about Binder business through "private" e-mail only.  Even reading these e-mail messages in the light most favorable to Steinhauser, they do not demonstrate that Hengtong knew Nothelfer had a fiduciary duty to Steinhauser, much less that Hengtong knew it was breaching any such duty.  Steinhauser also points to evidence that a Hengtong representative received commissions on the contracts with Binder but does not explain how this demonstrates Hengtong's knowledge that Nothelfer or Chakiris were violating any fiduciary duty owed to Steinhauser.

We conclude that Steinhauser's claims were properly dismissed on summary judgment where the facts, construed in the light most favorable to Steinhauser, do not show that Hengtong had specific knowledge that either Nothelfer or Chakiris was violating any fiduciary duty owed to Steinhauser, and where Steinhauser's claim for violation of G. L. c. 93A was wholly

18

derivative of its claims for civil conspiracy and aiding and abetting.[19]

Judgment affirmed.

By the Court (Milkey,
  Neyman & Hershfang, JJ.[20]),

*Paul Little*

Clerk

Entered:  July 26, 2024.

---

[19] Hengtong requests attorney's fees incurred in connection with this appeal and is entitled to an appropriate share of its fees pursuant to G. L. c. 93A, § 11.  Hengtong shall file a verified and itemized application for such fees and costs within fourteen days of the date of this decision, and Steinhauser and Jenkins will have fourteen days thereafter in which to file any opposition to the amounts requested.  See Fabre v. Walton, 441 Mass. 9, 10-11 (2004).

[20] The panelists are listed in order of seniority.